# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

Civil Action No.

FRANCINE M. MUGGE,

Plaintiff,

v.

HUMANA HEALTH PLAN, INC., and
HUMANA INSURANCE COMPANY,

Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff, Francine M. Mugge, by and through her undersigned counsel, hereby submits this Complaint and Jury Demand against Defendants Humana Health Plan, Inc. and Humana Insurance Company, and states as follows:

## I. PARTIES

1. Plaintiff Francine M. Mugge ("Mrs. Mugge" or "Plaintiff"), is a citizen and resident of the State of Colorado.

2. Defendants Humana Health Plan, Inc. and Humana Insurance Company (collectively "Humana" or "Defendants") are Kentucky corporations/insurance companies with their principal place of business located at 321 West Main Street, 12th Floor, Louisville, KY 40202.

## II. JURISDICTION AND VENUE

3. This case involves a controversy between citizens of different states, thereby extending the judicial power of the United States to cover this matter pursuant to Article III, § 2 of the United States Constitution. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1) as the amount in controversy in this civil action exceeds $75,000.00, and there is complete diversity of citizenship between Plaintiff and Defendants.

4. Personal jurisdiction is proper in this Court as Defendants have conducted business, breached a contract, and committed tortious conduct in the State of Colorado.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) as a substantial part of the events or omissions giving rise to the claims at issue occurred within the State of Colorado, and Defendants are subject to this Court's personal jurisdiction with regard to the civil action in question.

## III. GENERAL ALLEGATIONS

6. In 2013, Mrs. Mugge purchased a HMO Medical Policy through Humana, policy number 6836B9 (the "Insurance Policy"). Pursuant to an "Effective Date Rider", the Insurance Policy had an effective date of December 31, 2013 for "Bodily Injury" and "Sickness". According to the terms of the Insurance Policy, Humana promised to pay benefits for services rendered to all persons covered thereunder, which included Mrs. Mugge and any dependents, in exchange for Mrs. Mugge paying a monthly premium.

**Mrs. Mugge's Doctors and Hospital were "Network" Providers Under the Insurance Policy**

7. In or around January, 2014, Mrs. Mugge learned that she was pregnant with her third child. Over the next several months, she began making plans for the delivery of her child, including confirming with Humana that her doctors and hospital of choice, Rose Medical Center, were considered "network" providers under the Insurance Policy.

8. The Insurance Policy contained a provision instructing Mrs. Mugge on "How to find a network provider", which stated: "An online directory of *network providers* will be made available to *you* and is accessible via **Humana.com** at the time *you* apply for coverage. This directory is subject to change but is updated every 30 days. Due to the possibility of *network providers* changing status, please check the online directory of *network providers* prior to obtaining *services*. If *you* do not have access to the online directory, *you* may contact *us* prior to *services* being rendered or to request a directory."

9. Mrs. Mugge followed the instructions in the Insurance Policy by checking Humana's online directory and obtaining verbal confirmation that her providers and Rose Medical Center were "network" providers under the Insurance Policy.

**Medical Services Related to Mrs. Mugge's Pregnancy and Child Birth were Covered Benefits**

10. The Insurance Policy provided coverage for medical services in connection with Mrs. Mugge's pregnancy and child birth. According to its plain terms, the Insurance Policy covered "Newborn services" for a covered dependent newborn child, including "Bodily Injury or Sickness", "Care and treatment for premature birth", and "Medically diagnosed birth abnormalities". The Insurance Policy also specified that "*Policy* limitations and exclusions will

not apply to *services* for *bodily injury, sickness* or birth defects and abnormalities for the first 31 days following the birth of the newborn, other than for cleft lip, cleft palate and inherited enzymatic disorders."

11.     Additionally, the Insurance Policy contained a "Pregnancy and Contraceptives Rider", which defined "**Pregnancy services**" as "*Covered expenses* are *expenses incurred* for: 1. *Services* received from a *healthcare practitioner* for prenatal care, labor, delivery and postdelivery care; and 2. *Inpatient services* provided to the mother for: a. A minimum of 48 hours, following a vaginal delivery; or b. A minimum of 96 hours, following a cesarean section."

12.     Further, the Insurance Policy contained a "Patient Protection and Affordable Care Act Rider", which defined "Essential health benefits" as including:

- Emergency services;
- Hospitalization;
- Maternity and newborn care;
…
- Pediatric services, including oral and vision care.

13.     The Insurance Policy also expressly covered "**Complications of pregnancy**", including "Pre-term labor."

## The Insurance Policy Covered Emergency Care

14.     In addition to the foregoing provisions concerning pregnancy and child delivery, the Insurance Policy contained several provisions relating to emergency care, including that all "Emergency care" would be covered without the requirement of pre-authorization and without any restrictions on coverage for non-network providers. The Insurance Policy specified that "if emergency care is obtained through a non-network provider, [Humana] will pay benefits at the network level."

4

15. The Insurance Policy defined "Emergency care" as "*services* for a *bodily injury* or *sickness* that develops suddenly and unexpectedly and if not treated immediately would: 1. Endanger the *covered person's* life; or 2. Cause serious bodily impairment to the *covered person*.

16. The Insurance Policy defined "Bodily injury" as "bodily damage other than *sickness,* including all related conditions and recurrent symptoms, resulting from sudden, violent, external physical trauma which could not be avoided or predicted in advance. The *bodily injury* must be the direct cause of the loss, independent of disease, bodily infirmity or any other cause. Bodily damage resulting from infection or muscle strain due to athletic or physical activity is considered a *sickness* and not a *bodily injury*.

17. The Insurance Policy defined "Sickness" as disturbance in function or structure of the *covered person's* body which causes physical signs or symptoms which, if left untreated, will result in a deterioration of the health state of the structure or system(s) of the *covered person's* body.

18. Based on the foregoing, Mrs. Mugge felt satisfied and confident that her pregnancy and delivery would be covered network benefits under the Insurance Policy.

### Pursuant to the Insurance Policy, Mrs. Mugge's Newborn Child was a Covered Dependent

19. The Insurance Policy expressly considered any newborn child a "dependent" for coverage by specifying that "If a child is born to a *policyholder*, or any *covered person*, coverage for the newborn will be effective for 31 days from the moment of birth. To continue coverage beyond the first 31 days, *you* must notify *us* or complete an application and submit any required premium as applicable, within 31 days of the newborn's date of birth or the child will not be a *covered person* under this *policy*."

**The Insurance Policy Required Humana to Promptly Pay All Claims for Benefits**

20.     The Insurance Policy required Humana to pay claims within 30 days, specifying "Payments due under this *policy* will be paid no more than 30 days after *our* receipt of complete written or *electronic* proof of loss."

**Mrs. Mugge Goes Into Pre-Term Labor**

21.     On August 9, 2014, Mrs. Mugge, who was only 34 weeks pregnant, went into pre-term labor. Mrs. Mugge was transported to Rose Medical Center for the delivery of her baby. Given the gestational age of her baby, Mrs. Mugge and her medical providers were concerned about the pending premature birth of her child. At just after 7:00 p.m. on August 9, 2014, Mrs. Mugge gave birth to a baby boy, Benjamin John Mugge. In addition to the usual team of nurses and her treating Obstetrician, a team of medical providers from the Neonatal Intensive Care Unit ("NICU") was present in the delivery room in order to provide immediate care to the premature baby.

**The Baby is Taken to the Neonatal Intensive Care Unit**

22.     After Mrs. Mugge held her newborn baby for a few moments, it became clear that Benjamin was in distress. The NICU team took Benjamin from Mrs. Mugge, placed him on a table in the delivery room, and began to apply forced air and/or oxygen in an effort to clear his lungs and promote a healthy breathing pattern. After only a few moments, the NICU team made the decision to rush Benjamin to the NICU for more specialized care. Benjamin was deemed to be in critical care.

23.     While Mrs. Mugge remained in the delivery room for post-birth medical treatment, Benjamin was receiving emergency medical care in the NICU. The NICU team placed Benjamin

into a climate controlled incubator and began inserting and applying a number of monitors and machines to assist his breathing and maintain his body temperature. Benjamin was in pulmonary distress and was audibly and visibly gasping for air.

24. After completion of her post-birth medical treatment, Mrs. Mugge immediately went to the NICU to see her baby. Mrs. Mugge became emotionally distraught upon arriving in her baby's NICU room as the sight and sounds of the many tubes, wires, alarm bells, and other medical equipment surrounding her newborn son gave an indication that the baby was in physical distress. Mrs. Mugge's angst only grew upon hearing and seeing her newborn baby gasp for breath.

25. During the many consults with the treating Neonatologists and nurses, Mrs. Mugge was informed that she should expect Benjamin to remain in the NICU for up to six weeks as his lungs were under-developed, he needed to gain weight, and he needed to learn to feed without going into pulmonary distress.

26. Upon being informed of the extensive medical care Benjamin would require in the NICU, Mrs. Mugge took affirmative steps to confirm with Humana that Benjamin's treatment in the NICU was covered. Mea. Muffw placed a phone call to Humana and was informed that Benjamin's care would be covered as a dependent under the Insurance Policy.

27. During the time he spent in the Rose Medical Center NICU, Benjamin received around the clock care from a team of highly specialized nurses and Neonatologists. Among other care, Benjamin was treated with medication for his under-developed lungs, was placed in an infant Continuous Positive Airway Pressure ("CPAP") system, was fitted with sensors to measure body temperature and oxygen saturation rates, and was fitted with a feeding tube running through his

nasal passage and into his stomach. Benjamin was kept in a specialized incubator that maintained his body temperature and measured his weight down to the ounce.

28.     The emergency and critical care that Benjamin received at the Rose NICU was remarkable and proved to be highly effective. After a few days, Benjamin's breathing significantly improved. Benjamin also began quickly putting on weight and feeding well on his own without the aid of the feeding tube, which was subsequently removed. Benjamin progressed so well and so quickly that the NICU team discharged him from in-patient care after only eight days.

29.     Mrs. Mugge subsequently added Benjamin as a dependent on the Insurance Policy by notifying Humana of her decision to do so and paying an additional monthly premium. Humana added Benjamin as a named Dependent on the Insurance Policy with an effective date for Bodily Injury of December 31, 2013 and an effective date for Sickness of January 15, 2014.

### The Medical Providers Submit Bills to Humana

30.     Beginning in August, 2014, the medical providers who treated Mrs. Mugge and Benjamin sent bills to Humana for the care they rendered. Pursuant to the Insurance Policy, Humana was required to pay the bills within 30 days after receipt thereof.

31.     Among other providers and bills, Rose Medical Center sent Human several bills totaling over $70,000.00, and the NICU provider, Obstetrix Medical Group, sent Humana several bills totaling approximately $15,000.00.

### Humana Fails to Timely Pay Medical Claims and Bills

32.     Humana failed to pay the Rose and Obstetrix bills within 30 days as required by the Insurance Policy. Both Rose Medical Center and Obstetrix sent Mrs. Mugge correspondence

that Humana had failed to pay their bills on time and requested Mrs. Mugge's assistance in seeking payment from Humana.

33. Over the course of the next several months, Mrs. Mugge spent countless hours working to get Humana to pay the medical bills for Benjamin's birth, including numerous phone calls and letters from her husband.

### Humana Claims the Treatment for Benjamin was Rendered Before his Birth

34. Humana subsequently informed Mrs. Mugge that it was denying payment of the medical bills related to care for Benjamin as the treatment was rendered before he was born. Humana's explanation was nonsensical and absurd. The treatment rendered to Benjamin was obviously rendered upon and after his birth. Humana's stated reason for denial of payment was, therefore, unreasonable.

### Humana Claims the NICU Treatment was Not Emergency Care

35. During this same time frame, Humana informed Mrs. Mugge that the NICU providers from Obstetrix who treated Benjamin were "non-network" providers and, therefore, Mrs. Mugge would have to pay a higher out-of-network deductible for the NICU care Benjamin received. Humana explained that it did not consider the NICU care provided by Obstetrix to be "emergency care" and that the treatment was considered non-network.

36. Mrs. Mugge and her husband spent countless more hours working with Humana, Rose and Obstetrix in an effort to get Humana to pay the medical bills. The medical providers informed Mrs. Mugge that while they were willing to re-file the claims with Humana, Mrs. Mugge would be held financially responsible for payment of the bills if Humana did not reconsider. Mrs. Mugge and her husband made numerous phone calls to Humana to explain that Benjamin's NICU

care was indeed emergency care and that Mrs. Mugge was in no position to question, much less choose, which NICU providers treated her premature newborn upon his birth. Mrs. Mugge, her husband, and Obstetrix sent letters to Humana explaining the same and requesting Humana to reconsider its "non-network" decision.

37. Humana's decision caused Mrs. Mugge to suffer severe emotional distress. In addition, Humana's decision created financial problems as it became unclear which bills Mrs. Mugge was responsible for paying given that Humana determined a higher deductible applied. Mrs. Mugge believed that her follow-up care with her Ob/Gyn provider was covered at 100% because she had reached and paid in full her deductible. Because Humana determined that a higher deductible applied, however, the Ob/Gyn provider's bills were not covered at 100% and Mrs. Mugge was sent several collections notices threatening legal action.

### Humana Fails to Pay Benefits for Routine Medical Treatment

38. In or about December, 2014, Benjamin received routine medical treatment from his pediatrician, Dr. Amy Nash. Dr. Nash sent a bill to Humana for the treatment immediately thereafter. Humana, however, denied payment of the bill because it claimed that Mrs. Mugge had failed to pay required premiums on the Insurance Policy.

39. In addition, payment of Mrs. Mugge's standard post-natal visit with Rocky Mountain Ob/Gyn was also denied on the grounds that Mrs. Mugge allegedly failed to pay required premiums on the Insurance Policy.

40. The grounds Humana provided in support of its denial of both of the above claims were false. Mrs. Mugge never missed a premium payment and was current on her premium for the Insurance Policy at all times.

### Humana Issues Late Payment for the Rose Medical Bills

41.     In or around mid-December, 2014, over four months after Benjamin's birth, Humana finally issued payment to Rose Medical Center.  Humana offered no reasonable explanation for its delayed payment of the Rose bills.  Although the Insurance Policy required Humana to pay the Rose bills within 30 days after receipt thereof, Humana delayed payment by over 120 days.

### Humana Issues Late Payment for the Obstetrix Medical Bills

42.     In or around March, 2015, Mrs. Mugge's husband and Obstetrix filed a formal appeal of Humana's "non-network" decision.  The appeals again explained that Benjamin's NICU care was an emergency, that Mrs. Mugge was not in a mindsight to ask whether the NICU providers were in network, and that Mrs. Mugge really had no choice in the matter as it would have been impossible under the circumstances to identify and then transport Benjamin to another NICU that was in network immediately after his birth.

43.     The emotional distress, pain and suffering experienced by Mrs. Mugge continued to escalate as she was continuing to receive collections notices and feared that her family would have to pay a much higher deductible.  The added stress was particularly harmful as Mrs. Mugge was caring for her newborn son along with her two other children, and the financial burdens her family faced as a result of Humana's decision became nearly overwhelming during a very sensitive time.  Mrs. Mugge should have been able to spend her time focusing on her family rather than fearing collections and financial strain due to Humana's non-network decision.

44.     Finally, on or about May 30, 2015, over nine months after Benjamin's birth, Humana reversed its decision and agreed that the NICU treatment provided to Benjamin would be

considered in network.  Humana offered no reasonable explanation for delaying/denying payment of the medical bills for over nine months.  Although the Insurance Policy required Humana to pay the Obstetrix bills within 30 days after receipt thereof, Humana delayed payment by over 250 days.

45. Humana's denial and delay of payment of benefits that were covered under the Insurance Policy was unreasonable, and Humana knew, or recklessly disregarded the fact, that its conduct was unreasonable.  Further, Humana's "non network" decision was deceptive as Mrs. Mugge complied with Humana's instructions to confirm that Rose Medical Center was a network provider and Humana confirmed as much.  Mrs. Mugge had no reason to believe or question that the NICU providers, or any other providers for that matter, at Rose were non network providers and that she could be assessed a higher deductible for medical treatment over which she had no control after she and Benjamin were admitted at Rose Medical Center.

46. Humana's conduct caused Mrs. Mugge to suffer severe emotional distress, pain and suffering.

## FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

47. Mrs. Mugge hereby incorporates the preceding allegations as though fully set forth herein.

48. Mrs. Mugge entered into a binding agreement with Defendants for insurance coverage under which she agreed to pay premiums in exchange for Defendants' promise to pay covered benefits within 30 days of receiving a claim.

49. Mrs. Mugge fully complied with her obligations under the Insurance Policy, including paying all premiums.

50. Defendants breached their obligations under the Insurance Policy by failing to pay for covered benefits within the time frame required, denying and/or delaying payment of covered benefits without a reasonable basis to do so, determining Benjamin's NICU care was not an emergency and therefore considered "non-network", applying a higher deductible for Benjamin's NICU treatment, and denying payment of benefits on the untrue grounds that Mrs. Mugge had not made requisite premium payments and that the treatment for Benjamin was rendered prior to his birth.

51. Defendants' breaches of the Insurance Policy were willful, wanton, and reckless.

52. Mrs. Mugge has been damaged as a direct and proximate result of Defendants' breaches of contract in an amount to be proven at trial, including emotional distress, pain and suffering as a result of Defendants' conduct.

### SECOND CLAIM FOR RELIEF
**(Statutory Bad Faith)**

53. Mrs. Mugge hereby incorporates the preceding allegations as though fully set forth herein.

54. At all times pertinent hereto, the following statute of the state of Colorado was in effect:

**C.R.S. § 10-3-1115. Improper denial of claims – prohibited – definitions – severability.**

(1)(a) A person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant.

55. C.R.S. § 10-3-1116 provides a remedy for such denial or delay of payments in the form of "reasonable attorney fees, court costs, and two times the covered benefit."

56. Defendants unreasonably denied and/or delayed payment of benefits under the Insurance Policy in violation of C.R.S. §10-3-1115. There was no reasonable basis for Defendants' denial and/or delay in payment of benefits under the Insurance Policy.

57. Defendants' unreasonable denial or delay of payment of benefits under the Insurance Policy has caused Mrs. Mugge to suffer damages in an amount to be proven at trial, including emotional distress and anguish.

58. Defendants are subject to the provisions of C.R.S. § 10-3-1116 for double damages, court costs, and attorney's fees in addition to the economic and non-economic damages suffered by Mrs. Mugge.

### THIRD CLAIM FOR RELIEF
### (Common Law Bad Faith)

59. Mrs. Mugge hereby incorporates the preceding allegations as though fully set forth herein.

60. Defendants had a duty of good faith and fair dealing in the handling of claims for benefits under Mrs. Mugge's Insurance Policy.

61. Defendants breached that duty by delaying and/or denying payment of claims for benefits under Mrs. Mugge's Insurance Policy. Defendants did not have a reasonable or legitimate basis to delay and/or deny payment of claims for benefits under Mrs. Mugge's Insurance Policy.

62. Defendants acted in bad faith in the handling of claims for benefits under Mrs. Mugge's Insurance Policy as Defendants had knowledge that their failure to timely pay benefits under the Insurance Policy was unreasonable, and/or Defendants recklessly disregarded the fact that their failure to timely pay benefits under the Insurance Policy was unreasonable.

63. As a direct and proximate result of Defendants' bad faith, Mrs. Mugge has incurred general and special damages in an amount to be proven at trial.

## JURY DEMAND

64. Plaintiff Francine Mugge hereby demands a trial by jury.

WHEREFORE, Plaintiff Francine Mugge prays for judgment against Defendants for the harm, injuries, and losses Plaintiff has suffered as a result of Defendants' misconduct; an award of all economic, non-economic, general and special damages; an award of attorneys' fees, costs and pre and post-judgment interest pursuant to applicable contract, rule and/or statute; an award of double and/or treble damages pursuant to applicable statute; and for such other and further relief as this Court deems just and proper.

Respectfully submitted this 9th day of August, 2016.

SLG FIRM, LLC

*/s/ Zachary P. Mugge*
Zachary P. Mugge
SLG Firm, LLC
P.O. Box 46049
Denver, CO 80201
Phone: 720-223-6525
zmugge@slgoffice.com
*Counsel for Plaintiff*